IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| M2M SOLUTIONS LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. 12-32-RGA |
| ENFORA, INC., NOVATEL WIRELESS | : | |
| SOLUTIONS, INC., and NOVATEL | : | |
| WIRELESS, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

MEMORANDUM OPINION

Richard D. Kirk, Esq., Stephen B. Brauerman, Esq., Vanessa R. Tiradentes, Esq., Sara E. Bussiere, Esq., BAYARD, P.A., Wilmington, DE; Marc N. Henschke, Esq., FOLEY & LARDNER LLP, Boston, MA; Jeffrey N. Costakos, Esq., Kadie Jelenchick, Esq., FOLEY & LARDNER LLP, Milwaukee, WI; Jason J. Keener, Esq., Jeffrey J. Mikrut, Esq., FOLEY & LARDNER LLP, Chicago, IL.

Attorneys for Plaintiff M2M Solutions LLC.

Francis DiGiovanni, Esq., Thatcher A. Rahmeier, Esq., DRINKER BIDDLE & REATH LLP, Wilmington, DE; Christoper W. Kennerly, Esq., PAUL HASTINGS LLP, Palo Alto, CA; Elizabeth L. Brann, Esq., Jeffrey D. Comeau, Esq., PAUL HASTINGS LLP, San Diego, CA.

Attorneys for Defendants.

March 9, 2016

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are two summary judgment motions filed by Defendants and two *Daubert* motions, one filed by Plaintiff and one by Defendants. Specifically, Defendants filed a Motion for Summary Judgment of Non-Infringement and No Willfulness (D.I. 145), a Motion for Summary Judgment on Damages Issues (D.I. 142), and a Motion to Exclude M2M's Experts Richard Bero and Whitey Bluestein (D.I. 147).[1]  Plaintiff filed a Motion to Exclude Opinions of Dr. Choi. (D.I. 140). The motions are fully briefed. (D.I. 141, 144, 146, 148, 172, 174, 176, 179, 188, 194, 195, 196).

## I.    BACKGROUND

On January 13, 2012, Plaintiff M2M Solutions LLC filed five related patent infringement actions asserting infringement of U.S. Patent Nos. 8,094,010 ("the '010 patent") and 7,583,197 ("the '197 patent"). The Court held a *Markman* hearing, after which it invalidated the '197 patent and construed several claim terms in the '010 patent. (D.I. 90). The Court issued separate Memorandum Opinions on summary judgment motions (the "Telit SJ opinion") and *Daubert* motions (the "Telit *Daubert* opinion") in Plaintiff's related case against Telit. (C.A. No. 12-33-RGA, D.I. 247, 295). The parties have since agreed to withdraw certain arguments made in the present motions, conceding that the reasoning of the Telit SJ opinion applies with equal force to certain issues raised here. (D.I. 201 at 1–3).

The '010 patent claims a "programmable communicator device" that is capable of receiving transmissions, authenticating them using a particular form of coded number authentication, and storing numbers from authenticated transmissions in a list of permitted callers. ('010 patent, abstract & claim 1). The patent further contemplates a device that is

---

[1] Unless otherwise specifically noted, all references to the docket refer to Civil Action No. 12-32-RGA.

remotely programmable and that allows for remote data monitoring, "which can be used to relay information about the status of a remote piece of technical equipment such as a vending machine." (*Id.* col. 3, ll. 43–47; *id.* col. 4, ll. 3–7; *id.* col. 7, ll. 24–30).

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

3

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

**B.    *Daubert***

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

4

By means of a so-called *"Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[2]

The party offering expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993). In the context of calculating a reasonably royalty in a patent case under 35 U.S.C. § 284, the Federal Circuit has explained that "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted). "[G]iven the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award." *Id.* Further, the Federal Circuit has "consistently explained that proof of damages must be carefully tied to the claimed invention itself." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1324 (Fed. Cir. 2014); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) ("[T]his court has consistently held that a reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place." (alteration in original) (internal quotation marks omitted)). "While questions regarding which facts are most relevant

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but later amendments to it were not intended to make any substantive change.

for calculating a reasonable royalty are properly left to the jury, a critical prerequisite is that the underlying methodology be sound." *VirnetX*, 767 F.3d at 1328. "[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *CSIRO*, 809 F.3d at 1301 (internal quotation marks omitted).

## III.  DISCUSSION

### A.  Defendants' Motion for Summary Judgment of Non-Infringement and No Willfulness (D.I. 145)

Defendants' non-infringement and no willfulness motion raises three principal issues. First, Defendants argue that their accused products do not infringe because they do not satisfy the "permitted callers" limitation of the '010 patent. (D.I. 146 at 14–19). Second, they argue that the '010 patent is not drawn to functional capability and that proving infringement therefore requires a showing, not made by Plaintiff, that the accused products have actually performed the function of authenticating incoming transmissions. (*Id.* at 19–22). Third, Defendants argue that they are entitled to summary judgment of no willful infringement. (*Id.* at 23–24).[3]

In the Telit SJ opinion, I recently addressed the same issues that Defendants raise in their second and third arguments here. (C.A. No. 12-33-RGA, D.I. 247 at 7–14, 33–35). Specifically, I held that the "claims at issue here only require capability of performing the recited function." (*Id.* at 14). Defendants subsequently conceded that this holding applies to their second argument

---

[3] Defendants also separately brief an argument that there is no indirect infringement. (D.I. 146 at 22–23). This section of their brief, however, merely argues that Plaintiff has not proved any underlying direct infringement, by rehashing Defendants' non-infringement arguments. (*Id.*). Accordingly, Defendants' motion for summary judgment of no indirect infringement will be denied for the same reasons set forth regarding their literal infringement arguments.

Defendants also move for summary judgment of no infringement under the doctrine of equivalents, arguing that Plaintiff and its experts have not alleged any theory of infringement under the doctrine of equivalents. (D.I. 146 at 22). Plaintiff essentially admits that it has no doctrine of equivalents infringement theory by declining to respond to this argument in its briefing. Accordingly, because Plaintiff does not present any disputed issues of material fact or credible legal arguments, Defendants are entitled to summary judgment of no infringement under the doctrine of equivalents.

here, and "agree[d] to withdraw [their] motion for summary judgment on these grounds only."

(D.I. 201 at 1). Accordingly, Defendants are not entitled to summary judgment on these

grounds. In the Telit case, I also held that Telit was entitled to summary judgment of no

willfulness, because with the '010 patent having issued mere days before the suit was filed,

M2M did not "present[] evidence of pre-suit knowledge or conduct tending to establish objective

recklessness." (C.A. No. 12-33-RGA, D.I. 247 at 35). As this issue was decided as a matter of

law and the facts are the same, Plaintiff subsequently "agree[d] that the Court's ruling as to Telit

should apply to [Defendants] as well." (D.I. 201 at 2). Accordingly, Defendants are entitled to

summary judgment of no willfulness for the reasons set forth in the Telit SJ opinion. (C.A. No.

12-33-RGA, D.I. 247 at 33–35).

      With respect to its remaining argument regarding the "permitted caller" limitation,

Defendants argue that the accused products do not meet the permitted caller limitation because

the accused products "do not accept only calls from permitted callers, and reject all calls from

non-permitted callers, as the 'permitted callers' limitation requires." (D.I. 146 at 14).

Defendants argue that this Court's claim construction inherently requires that the "device reject

or ignore calls from non-permitted callers—*i.e.*, callers whose numbers are not contained in the

'permitted callers' list." (*Id.* at 15). Plaintiff's infringement theory is that two features in the

accused products can serve as a permitted callers list under the Court's construction: (1) the

SMSDA White List, or (2) the Friends Firewall. (*Id.* at 16 (citing D.I. 152-2 at 10–12, ¶¶ 38–

43)). Defendants assert that their expert, Dr. Negus, tested the accused SMSDA White List and

Friends Firewall features in the accused products and concluded that "even when the lists were

enabled and populated with a telephone number or IP address, the accused products still did not

reject or ignore such incoming calls from non-permitted callers." (*Id.* at 16 (citing D.I. 152-7 at

¶¶ 71, 73, 75, 77, & 189)).  Thus, Defendants argue that, because Plaintiff does not contest the validity of these results per se, Defendants' "evidence is unrebutted that the accused products do not reject many types of real 'calls' . . . from unlisted numbers and addresses," and therefore do not infringe.  (*Id.* at 17).

Plaintiff argues that Defendants do "not dispute that the SMSDA white list and the Modem Friends firewall list features in its accused products may well be capable of screening 'certain types' of incoming calls in the manner required by the Court's construction," but instead Defendants merely argue that these features are not permitted callers lists because they do not automatically reject *all* incoming calls from numbers not included in the lists.  (D.I. 172 at 19–20).  Plaintiff asserts that Defendants misconstrue the Court's construction of "permitted caller" to require a permitted callers list to automatically screen all types of incoming calls.  (*Id.* at 20).  Accordingly, Plaintiff contends that the Court's construction "simply requires that a 'permitted callers' list be capable of screening one or more types of incoming calls in the recited fashion."  (*Id.*).  Plaintiff suggests that, under the '010 patent and the court's construction, "a 'permitted callers' list can permissibly be designed to selectively screen only certain types of incoming calls and not others."  (*Id.* at 20–21).  Thus, Plaintiff's expert Dr. Nettleton opines that these features of the accused products can act to screen a certain type of incoming message, "in exactly the manner required by the court's construction."  (*Id.* at 21 (citing D.I. 173-4 at 17–18, ¶ 24)).

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent . . . ."  35 U.S.C. § 271(a).  A two-step analysis is employed in making an infringement determination.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  First, the court must construe the asserted claims to ascertain their meaning and scope.

*See id.* Second, the trier of fact must then compare the properly construed claims with the accused infringing product. *See id.* This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if at least one limitation of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). "Thus, summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue as to whether" the accused product is covered by the claims (as construed by the court). *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

I conclude that Defendants are not entitled to summary judgment based on their argument that the "permitted caller" limitation is not met, as they misconstrue what the '010 patent and my claim construction require. The relevant claim limitation reads as follows:

> A memory module for storing the at least one telephone number or IP address from the authenticated transmission as one of one or more permitted callers if the processing module authenticates the at least one transmission by determining that the at least one transmission includes the coded number . . . .

('010 patent, claim 1 (col. 12, ll. 38–43)).   I construed the term permitted caller to mean "[a] telephone number or IP address on a list of numbers that are designated to cause the programmable communicator to accept an incoming call received from that number." (D.I. 90 at 6–8).  In the Telit SJ opinion, I held that the "memory module" claim limitation of the '010 patent, where the permitted caller term appears, is drawn to functional capability. (C.A. 12-33-RGA, D.I. 247 at 9–10; *id.* at 12–13 ("The language of the 'memory module' claim limitation similarly provides additional structure to describe the operation of the stated 'storing' function. . . . I conclude that the '010 patent contains apparatus claims with functional limitations . . . .")).[4]

The fact that the memory module limitation is directed to functional capability means that the infringement inquiry with regard to this limitation is whether the accused feature is capable of performing the function of storing telephone numbers or IP addresses from authenticated transmissions in a permitted callers list. ('010 patent, col. 12, ll. 38–43).  To meet the permitted caller term within that limitation, in turn, the features accused of meeting that limitation must be capable of "caus[ing] the programmable communicator to accept an incoming call received" from a number on the list.  (D.I. 90 at 6–8).  Defendants' position is that the converse of my construction of permitted caller must be true, in other words, that my construction implicitly

---

[4] The Telit SJ opinion gives a detailed explanation of my conclusion that the '010 patent claims an apparatus with certain functional capabilities.  (C.A. No. 12-33-RGA, D.I. 247 at 7–14).

requires that a permitted callers list "not accept" calls from numbers not on the list. Even
assuming this is the case,[5] this limitation is still directed to functional capability, meaning an
accused product would still infringe if it were capable of "not accepting" or screening calls from
numbers not on the permitted callers list. In other words, even under this interpretation, the
capability-driven claims would not require the permitted callers list to indiscriminately reject
every call from a non-listed number. Instead, they would require that the product provide a user
with the capability to employ the permitted callers list to screen communications in this manner.

Plaintiff's expert, Dr. Nettleton, opines that the SMSDA white list "can store up to five
different telephone numbers corresponding to remote devices" and "[t]he telephone numbers
stored in populated SMSDA white lists are the only originating telephone numbers from which
the Enabler IIIG modules will accept incoming specially formatted AT Commands Over SMS
data messages for processing by their firmware." (D.I. 152-2 at 10, ¶¶ 38–39). If incoming
commands are from a number on the white list, he opines that "the 'Firmware Components' will
process and execute any AT commands contained in the incoming . . . message," but if the
number is not on the list, "the firmware will not accept the incoming specially formatted SMS
data message for processing, and will not execute any AT commands contained therein." (*Id.* at
10, ¶ 39). Dr. Nettleton provides a similar opinion as to the accused products' Modem Friends
firewall feature. (*Id.* at 11–12, ¶¶ 41–43). On the other hand, the opinions offered by
Defendants' expert, Dr. Negus, do not refute that the accused products are capable of using the
accused features in the manner described by Dr. Nettleton. Instead, Dr. Negus ran tests on these

---

[5] Although not argued or briefed, the parties seem to agree that my construction of "permitted caller" implicitly
requires a permitted callers list to cause—or, in Plaintiff's case, be capable of causing—the programmable
communicator device to not accept (e.g., to reject) incoming calls received from numbers not stored in the permitted
callers list. (D.I. 146 at 15; D.I. 172 at 8). I need not now decide whether this is actually the case, as the issue has not
been briefed and would not alter my present decision to deny summary judgment of non-infringement.

SMSDA white list and Modem Friends firewall features, with and without numbers populated in

the lists, and concluded that the devices do not reject certain types of calls from numbers not on

the list, such as SMS messages, telephone calls, and Skype calls over a wireless network. (D.I.

152-7 at 13–15, ¶¶ 73, 75, & 77). Specifically, Dr. Negus opines that calls from unlisted

numbers ring and can be answered, and messages go through. (*Id.*).

While Dr. Negus's testimony may be unrebutted in showing that the accused products do

not automatically reject all types of calls from numbers not on a permitted callers list, it does

nothing to assist the trier of fact in its relevant inquiry into whether the accused products are

capable of employing the SMSDA white list or Modem Friends firewall features in a manner

consistent with the permitted caller limitation. As Plaintiff puts it, Dr. Negus's product testing

"demonstrat[es] the unremarkable proposition that the accused 'permitted callers' list features do

not serve to screen certain types of incoming calls that they are not designed to screen." (D.I.

172 at 14). Plaintiff further explains that "the accused SMSDA white lists are designed to screen

a certain specially formatted type of incoming SMS data messages," and "the accused Modem

Friends firewall lists are designed to screen a certain specially formatted type of incoming

UPD/IP data messages," yet Dr. Negus only shows that these features do not screen other types

of incoming transmissions that they are not designed to screen. (*Id.* at 14–15 (citing D.I. 152-7

at 11–16, ¶¶ 68–82)).

Aside from the fact that the '010 patent claims functional capability, Defendants' non-

infringement argument is fundamentally inconsistent with my claim construction in another

respect. In the claim construction opinion, I rejected Defendants' argument that the specification

required the permitted callers list to cause the device to ring or answer (as opposed to using

"accept"), reasoning that "Defendants' construction that would require the programmable

communicator to 'ring or answer' is too narrow." (D.I. 90 at 8). I explained that requiring a ring or answer "would read the optional features of a described embodiment into the claims," when "other disclosed embodiments . . . are based on data messages that do not require the answering limitation." (*Id.* (citing '010 patent, col. 3, ll. 43–52; *id.* col. 4, ll. 8–13)). I subsequently denied Plaintiff's motion for reconsideration that sought to change the word "call," in the construction of permitted caller, to "transmission," again reiterating that my original construction did not read out "disclosed embodiments, or their accompanying data messages," such as "circuit-switched calls, SMS data messages, and packet-switched data messages." (D.I. 107 at 4).

Defendants' position now is that the converse of my construction of "permitted caller" must be true, in other words, that my construction implicitly requires that a permitted callers list "not accept" calls from numbers not on the list. (D.I. 146 at 15). Even if that is the case, however, the fact that I expressly declined to limit the term "accept" to "ring or answer" is significant. (D.I. 90 at 8). Under my construction, the word call is not limited to a telephone call and accept is not limited to ring or answer. Accordingly, demonstrating that messages from numbers not on the permitted callers list simply go through (e.g., are received) does not necessarily establish that there has been "acceptance" for purposes of this claim construction, because "accepting" is not limited to ringing, answering, or, by extension, merely going through. This seems especially true when the underlying purpose of a message is to send a command to reprogram the device, with information contained in the "accompanying data messages." (D.I. 107 at 4). Indeed, the specification of the '010 patent clearly contemplates that the programmable communicator device can be reprogrammed through commands contained in messages from permitted callers, in the manner described by Dr. Nettleton in his opinion. ('010 patent, col. 4, ll. 8–13; *id.* col. 10, ll. 1–22). Therefore, the accused features would still be acting

13

as a permitted callers list by not processing and executing programming commands—by not

accepting them—from telephone numbers not on the permitted callers list.  This is precisely the

form of non-acceptance Dr. Nettleton suggests in his opinion, where he asserts that the accused

products do not accept and execute programming commands (contained in SMS messages) that

come from numbers not on the permitted callers list.  (D.I. 152-2 at 10–12, ¶¶ 38–43).

Accordingly, Dr. Nettleton's opinions, that the accused SMSDA white list and Modem Friends

firewall features can operate in a manner consistent with the court's construction of permitted

callers, should be submitted to the jury.

For the reasons discussed above, Defendants have not established that there are no

genuine issues of material fact as to whether the accused products meet the permitted caller

limitation.  Therefore, Defendants are not entitled to summary judgment of non-infringement on

these grounds.  *See Pitney Bowes*, 182 F.3d at 1304.

### B.      Plaintiff's Motion to Exclude Opinions of Dr. Choi (D.I. 140)

The second *Georgia-Pacific* factor, which is implicated by this *Daubert* motion, looks at

"[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit."

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  "This

factor examines whether the licenses relied upon . . . in proving damages are sufficiently

comparable to the hypothetical license at issue in suit."  *Lucent Techs, Inc. v. Gateway, Inc.*, 580

F.3d 1301, 1325 (Fed. Cir. 2009).  "[T]here must be a basis in fact to associate the royalty rates

used in prior licenses to the particular hypothetical negotiation at issue."  *Uniloc USA, Inc. v.*

*Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).  It is improper to "rely on license

agreements that were radically different from the hypothetical agreement under consideration to

determine a reasonable royalty."  *Id.* at 1316 (internal quotation marks omitted).  "[C]omparisons

of past patent licenses to the infringement must account for the technological and economic

differences between them." *Worldtech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d

1308, 1320 (Fed. Cir. 2010) (internal quotation marks omitted).   "When relying on licenses to

prove a reasonable royalty, alleging a loose or vague comparability between different

technologies or licenses does not suffice." *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694

F.3d 51, 79 (Fed. Cir. 2012).   "The testimony of a damages expert in a patent suit who relies on

non-comparable licenses in reaching his royalty rate should be excluded." *DataQuill Ltd. v.*

*High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1022 (S.D. Cal. 2011).

Defendants' damages expert, Dr. William S. Choi, relies on two license agreements to

support his reasonable royalty analysis: (1) a May 31, 2013 confidential settlement agreement

and license between Company A and Enfora ("the Company A license"), and (2) a May 29, 2012

settlement and patent license agreement between Company B and Enfora ("the Company B

license").[6]   (D.I. 143-3 at 2–10; D.I. 143-4 at 2–10).   Dr. Choi opined that the hypothetical

negotiation would have taken place around January 10, 2012, the date the '010 patent issued, and

Plaintiff does not challenge this date.   (D.I. 143-1 at 12, ¶ 21).   As the above Federal Circuit

precedent makes clear, Defendants must affirmatively show that the prior licenses Dr. Choi relies

upon are actually comparable to the license that the parties would have negotiated for the '010

patent before introducing this evidence to the jury.

Plaintiff moves to exclude the testimony of Dr. Choi to the extent he relies on the

Company A and Company B license agreements, on the grounds that these licenses are not

---

[6] In order to avoid issues about third-party confidentiality, the pseudonyms "Company A" and "Company B" are used.

technologically or economically comparable to the patent-in-suit. (D.I. 141 at 4).[7]  Plaintiff

asserts that the license agreements are not technologically comparable to the patent-in-suit

because they cover the narrow field of vehicle-tracking technology, as opposed to the '010

patent's broad application across industries.  (*Id.* at 4, 10–11).  Plaintiff further argues that the

two licenses are not economically comparable to the '010 patent, because they license rights to

multiple patents and are settlement agreements, entered into in a much different context than a

hypothetical negotiation involving two willing licensors.  (*Id.* at 4, 7–9).  Defendants argue that

Plaintiff has not provided any expert testimony to counter "Dr. Negus's or Dr. Choi's findings

regarding the comparability of these agreements to this case."  (D.I. 176 at 9).  Defendants

maintain that Dr. Choi's opinion, in relying on Defendants' technical expert, Dr. Negus,

establishes that, "Both agreements were between Enfora and a non-practicing entity, both

involved user features, and both were entered around the time of the hypothetical negotiation

date."  (*Id.* at 8).  Defendants further assert that, to the extent the licenses are not directly

comparable to the hypothetical negotiation at issue in this case, Dr. Choi's use of them was

sound because he did not extract his royalty rate from them, but instead used them as a sanity

check to confirm that his royalty analysis based on the availability of non-infringing alternatives

was reasonable.  (*Id.* at 10).

The settlement agreement between Company A and Enfora took place on May 31, 2013,

almost a year and a half after the hypothetical negotiation at issue here.  (D.I. 143-3 at 10).

Enfora agreed to pay $195,000 to settle the litigation and take a worldwide nonexclusive license

to five U.S. patents, as opposed to the single U.S. patent at issue here.  (*Id.* at 4, 7).  The license

---

[7] Plaintiff's motion seeks only to exclude Dr. Choi's reliance on these license agreements.  The motion does not seek to exclude Dr. Choi's separate opinion as to a lump sum reasonable royalty based on an allegedly non-infringing alternative.  (D.I. 141 at 4).

itself was titled "GPS Patent License Agreement" and all five patents relate to vehicle-tracking technology. (*Id.* at 7; D.I. 176 at 5 n.2). Dr. Choi's entire comparability analysis is as follows:

> I understand from Dr. Negus that the agreement covers substantially similar products as those accused by M2M Solutions. In addition, I understand from Dr. Negus that the technology in this agreement addresses particular user features, which would have greater value to users than the user feature addressed by the '010 patent. Furthermore, the agreement was between Enfora and a patent holding company, which is similar to the parties in the hypothetical negotiation.

(D.I. 143-1 at 32, ¶ 62 (footnotes omitted)).[8] Although Dr. Choi does not cite Dr. Negus's expert report, Dr. Negus's report independently provides similarly nebulous statements of comparability. Dr. Negus opines that the Company A license covers "at least some substantially similar Enfora products to those accused by M2M of infringing the '010 patent," that the Company A license and the '010 patent both "address[] only particular user features," and "the [Company A] Patents are significantly more valuable than the '010 patent because the user features addressed by the [Company A] Patents are of much greater value to users than the user feature addressed by the '010 patent." (D.I. 143-6 at 4, ¶ 437). Dr. Negus's only attempt to relate the Company A license to the '010 patent with any specificity is his conclusion that "Exemplary Claims of the [Company A] Patent[s] recite a 'vehicle tracking system' or a 'tracking unit for a vehicle' comprising known elements but with a functional limitation directed to a particular condition at which certain information or status is transferred 'to a monitoring station.'" (*Id.*).

The settlement and patent license agreement between Company B and Enfora was entered into on May 29, 2012, only several months after the hypothetical negotiation here. (D.I. 143-4 at 10). Enfora agreed to pay $145,000 to settle the litigation and take a worldwide, non-

---

[8] To support these propositions, Dr. Choi cites generally to "Discussions with Dr. Kevin Negus, Novatel's Technical Expert." (D.I. 143-1 at 32 nn. 99, 101–02).

exclusive license to U.S. Patent No. 5,223, 844, titled "Vehicle Tracking and Security." (*Id.* at 2, 4). The agreement indicated that Company B calculated a settlement payment of $290,000, but agreed to a discount of 50% "in recognition of early settlement and other considerations." (*Id.* at 4). Dr. Choi provides a comparability analysis between the Company B license and the '010 patent that is practically identical to that he provided with regard to the Company A license, again relying on Dr. Negus. (D.I. 143-1 at 32–33, ¶ 63). Dr. Negus also provides an almost identical recitation of comparability to that he provided for the Company A license agreement. (D.I. 143-6 at 3–4, ¶ 436).

I conclude that Plaintiff has not met its burden of demonstrating that there is "a basis in fact to associate the royalty rates used in [these] prior licenses to the particular hypothetical negotiation at issue in [this] case." *Uniloc*, 632 F.3d at 1317. First, Dr. Choi provides little more than ambiguous conclusions of technological comparability between the two license agreements and the '010 patent, without any rationale other than undisclosed conversations with Dr. Negus. Yet both Dr. Choi and Dr. Negus make almost zero reference to the specific technology involved in either the'010 patent or the Company A and Company B licenses, aside from the hazy reasoning that they all relate to product features rather than core technology. *See VirnetX*, 767 F.3d at 1326 (reiterating that royalty estimates must focus on "damages attributable to the infringing features"). These loose, vague allegations of technological comparability, without any explanation, are insufficient, and do not even provide a basis to meaningfully assess technological comparability. *See Laser Dynamics*, 694 F.3d at 79. Instead, Defendants invite the Court to blindly accept the unsubstantiated conclusions of its experts and point out that Plaintiff does not provide expert testimony in rebuttal. I decline to do so, because Defendants have the burden of establishing comparability in the first place. *See Daubert v. Merrell Dow*

*Pharm., Inc*, 509 U.S. 579, 592 n.10 (1993).  Without any meaningful analysis, Dr. Choi and Dr.

Negus's conclusions of technological comparability are nothing more than *ipse dixit*.

Second, and most importantly, with regard to economic comparability, Dr. Choi's

analysis virtually ignores the fact that these two licenses resulted from litigation settlements,

providing a drastically different backdrop than the hypothetical negotiation involving two willing

licensors, as would be the case here.  Federal Circuit precedent is hostile toward using litigation

settlement agreements in proving a reasonable royalty, except in limited circumstances.  *See*

*LaserDynamics*, 694 F.3d at 77–78 ("The notion that license fees that are tainted by the coercive

environment of patent litigation are unsuitable to prove a reasonable royalty is a logical

extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be

reached between a willing licensor and a willing licensee . . . ."); *ResQNet.com v. Lansa, Inc.*,

594 F.3d 860, 870–72 (Fed. Cir. 2010) (allowing testimony regarding settlement license for

patent-in-suit that was "the most reliable license in [the] record," when compared to licenses that

did not "mention[] the patents in suit or show[] any other discernible link to the claimed

technology").  The settlement licenses here were not for the patent-in-suit and are only connected

to the claimed invention by vague conclusions from Defendants' experts.  Dr. Choi makes no

effort to account for the fact that these agreements were litigation settlements.  He provides no

background information about the litigation preceding these agreements or the overall context of

the settlements.  Instead, Dr. Choi ignores the settlement context altogether and focuses on the

fact that the licenses were between Enfora and a non-practicing entity.  Under Dr. Choi's

rationale, any license between Enfora and a non-practicing entity would be economically

comparable to a hypothetical negotiation between Enfora and a different non-practicing entity,

regardless of the specific technology or whether the licenses resulted from litigation settlements.

19

These unsubstantiated conclusions about economic comparability, lacking in analysis, again provide nothing more than *ipse dixit*. Accordingly, there is no showing that the Company A and Company B licenses are economically comparable to the '010 patent. Dr. Choi has failed to account for the economic differences between the '010 patent and the two asserted license agreements. *See Worldtech*, 609 F.3d at 1320.

Lastly, I find little merit in Defendants' argument that Dr. Choi can use incomparable licenses in his reasonable royalty analysis if he only uses them as a "sanity check," rather than using them to drive the analysis. Federal Circuit precedent requires that for a license to be used in a damages analysis, the license must be proven comparable to the hypothetical negotiation. *See, e.g.*, *Lucent Techs.*, 580 F.3d at 1325. Defendants cannot escape this requirement by suggesting that the incomparable licenses only played a minor role as a quantitative reference point, instead of being a driving force in the reasonable royalty estimate. In sum, Defendants have not met their burden of establishing that the Company A and Company B licenses that Dr. Choi relies upon are sufficiently comparable, either technologically or economically. To the extent that significant economic differences between the hypothetical negotiation at issue and these past license agreements are readily apparent to the Court due to the licenses' litigation settlement context, Dr. Choi fails to even attempt to account for these differences. Accordingly, Dr. Choi's references to the Company A and Company B license agreements are excluded.

### C.    Defendants' Motion to Exclude Plaintiff's Experts Richard Bero and Whitey Bluestein (D.I. 147)

Defendants move to exclude to the testimony of Plaintiff's damages experts Richard Bero and Whitey Bluestein. (D.I. 147). Defendants raise arguments (D.I. 148) that are almost identical to those I considered in the Telit *Daubert* opinion (C.A. No. 12-33-RGA, D.I. 295). In the Telit case, I excluded the testimony of Mr. Bluestein and Mr. Bero for employing an

unreliable methodology in calculating damages. (*Id.* at 5–14). Mr. Bluestein and Mr. Bero use the same methodology here, rendering the Telit *Daubert* opinion dispositive as to Defendants' current motion. Accordingly, I will grant Defendants' motion to exclude their testimony.

### D.    Defendants' Motion for Summary Judgment on Damages Issues (D.I. 142)

Defendants' Motion for Summary Judgment on Damages Issues raises two arguments. First, Defendants argue for summary judgment that no damages can be awarded for products manufactured and shipped abroad, for not falling under the purview of 35 U.S.C. § 271. (D.I. 144 at 12–13). Second, Defendants argue that the Court should grant summary judgment that damages can be no greater than $120,000, to properly reflect the minimal costs of implementing acceptable, non-infringing alternatives. (*Id.* at 13–22). For the reasons that follow, I will grant Defendants' motion as to the first issue, and deny Defendants' motion on the second issue.

#### 1.    Foreign Sales

Defendants argue that products manufactured and shipped abroad are not subject to damages for infringement. (D.I. 144 at 12–13). Defendants contend that Mr. Bero's damages assessment, which calculates damages based on all worldwide sales of Defendants' products,[9] improperly includes products that do not infringe, because there is no proof the products reach the United States. (*Id.* (citing D.I. 152-8 at 9, 48–49)). Accordingly, Defendants argue that Plaintiff cannot pursue damages for products that it has not proven have entered the United States. (*Id.*). Plaintiff, on the other hand, argues that it is "properly seeking to hold [Defendants] accountable for products it sells to U.S. customers even though some of those products are

---

[9] Mr. Bero provides two distinct calculations: one using Defendants' worldwide sales and another alternative analysis using only Defendants' U.S. sales, in case Plaintiff "is only able to recover damages on what it refers to as [Defendants'] U.S. sales." (D.I. 152-8 at 9 & n.9, 48–49). Although Mr. Bero's testimony has been excluded, I assume that the issue of what products Plaintiff wants to include in a future damages calculation remains the same.

shipped by [Defendants] to a facility abroad prior to being imported into the United States."
(D.I. 174 at 8).

I extensively considered identical arguments in the Telit SJ opinion. (C.A. No. 12-33-RGA, D.I. 247 at 35–48). I stated the relevant legal framework there. (*Id.* at 35–38, 45–46). The crux of my opinion in the Telit case was that where, as here, a defendant's products are manufactured abroad and shipped abroad to a foreign contract manufacturer, "it is Plaintiff's burden to prove that the accused products made it into the United States, for purposes of proving that anyone directly infringed." (*Id.* at 46). I suggested that Plaintiff could have met that burden by "present[ing] any evidence from which a jury could determine how many products sold abroad actually made their way into the U.S. . . ." (*Id.* at 43–44). I also reasoned that "Plaintiff could have taken some third-party discovery of these customers to prove that at least some accused products were eventually imported to the U.S. . . . . [which] could conceivably have provided Plaintiff's expert with a reasonable basis to estimate how many accused products made it into the U.S." (*Id.* at 44).

The situation presented here is nearly identical to that considered in the Telit SJ opinion. Accordingly, the rationale of the Telit SJ opinion applies with equal force here. As with Telit, the products at issue here, which are manufactured abroad and shipped to destinations abroad, amount to "domestic contracts for foreign sales." (*Id.* at 42). Therefore, it is Plaintiff's burden to offer evidence of which products shipped abroad actually made it to the U.S. and are therefore subject to 35 U.S.C. § 271. As in the Telit case, Plaintiff's expert again employs an all-or-nothing approach, seeking to assess damages on Defendants' worldwide sales, rather than presenting facts or a data-backed estimate of how many products shipped abroad actually reach the U.S. Plaintiff's approach is plainly insufficient to overcome the presumption against

22

extraterritoriality. *See, e.g.*, *Microsoft v. AT&T Corp.*, 550 U.S. 437, 454–55 (2007) ("The

presumption that United States law governs domestically but does not rule the world applies with

particular force in patent law."); *Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell*

*Semiconductor, Inc.*, 964 F. Supp. 2d 653, 655–56 (E.D. Tex. 2013) ("Any doubt regarding

whether conduct falls outside the purview of United States patent law should be resolved by the

presumption against extraterritoriality." (citing *Microsoft*, 550 U.S. at 454)).

      Plaintiff argues that the Court's rationale from the Telit SJ opinion should not apply here,

because the facts here are distinguishable. (D.I. 201 at 2). Specifically, Plaintiff asserts that

Defendants' Rule 30(b)(6) representative, Ron Schooler, admitted that he is aware that some of

Defendants' customers may request that products purchased be shipped to contract

manufacturers abroad, even though the products eventually end up in the U.S. (*Id.*). Indeed, Mr.

Schooler admitted during his deposition that customers do this from time of time. (D.I. 175-1 at

29). He identified one company that did this (Company C), and indicated that Company C was

Defendants' largest customer.[10] (*Id.* at 30, 35). Mr. Schooler estimated that Company C

purchases approximately $8 million of accused products per year from Defendants and mainly

distributes products in the U.S. (*Id.* at 30, 35).

      Implicit in Plaintiff's later assertion of these admissions seems to be an argument that

Plaintiff should be able to include sales to Company C that are shipped abroad in its damages

calculation. The Court is not aware, however, of any expert opinion that includes only sales to

Company C within Plaintiff's damages estimate and Plaintiff has never made this argument. The

issue presently before the Court is whether Plaintiff may seek damages on *all* of Defendants'

sales that were manufactured and shipped abroad, with only proof that *a single customer of*

---

[10] Again, to protect third-party confidentiality, a pseudonym, "Company C," is used here.

*Defendants sometimes* imports products shipped abroad into the U.S. I conclude that Plaintiff

cannot arbitrarily seek damages on all of Defendants' worldwide sales in this fashion, because it

would flout the presumption against extraterritoriality, as explained more thoroughly in the Telit

SJ opinion. Accordingly, I will grant Defendants' motion for summary judgment of no damages

for foreign sales.

### 2. Motion to Limit Damages to $120,000

Defendants argue that—because their technical expert, Dr. Kevin Negus, presented

unrebutted testimony that a commercially acceptable, non-infringing alternative could be

implemented for no more than $60,000—the Court should limit Plaintiff's potential damages to

$120,000 with a summary judgment ruling. (D.I. 144 at 13–22). In light of Dr. Negus's

testimony, Defendants' damages expert, Dr. Choi, opined that a reasonable royalty would have

been no greater than $120,000, in light of the direct and indirect costs to implement one of those

non-infringing alternatives. (*Id.* at 14–15 (citing D.I. 152-12 at ¶¶ 2, 87)). More specifically, Dr.

Negus opined that Defendants could have implemented at least three commercially-acceptable

alternatives that would not infringe, summarized in Defendants' brief as follows:

- **Alternative #2:** "eliminate both the MDMID and API Password fields from all AT commands"—which would cost no more than $40,000 to implement;
- **Alternative # 3:** "eliminate both the MDMID and API Password fields from the AT Commands that modify entries within the SMSDA facility and the modem friend/server list facility"—which would cost no more than $60,000 to implement; and
- **Alternative #5:** Novatel's N4A Platform—which would not cost anything to implement in and of itself.

(*Id.* at 14 (citing D.I. 152-7 at 60–63, ¶¶ 411–12, 414)). Defendants argue that Plaintiff has not

provided any credible evidence to rebut Dr. Negus's testimony that these various alternatives

were non-infringing, commercially acceptable, and available at the ease and cost outlined. (*Id.* at

15). Specifically, Defendants point out that the only evidence Plaintiff presents to counter this

24

testimony is the unsupported opinion of Mr. Bluestein, a non-technical expert whose testimony

has since been excluded by this Court. (*Id.* at 15–21; D.I. 210 at 1). Thus, Defendants contend

that—because the opinions of Dr. Negus and Dr. Choi on the cost, availability, and commercial

acceptability of non-infringing alternatives stand unrebutted—there are no genuine issues of

material fact and damages in the case should be limited to $120,000.

Plaintiff originally contended—relying on the opinions of Mr. Bluestein and his analysis

of the Beacham Reports—that Dr. Negus's proposed alternatives would not be commercially

acceptable to a significant amount of customers, were not available at the time of the

hypothetical negotiation, and that Defendants' sales may not have been the same without the

accused features. (D.I. 174 at 10–18 (citing D.I. 175-6 at 3–5, ¶¶ 5–6, 8)).[11]   In the alternative,

Plaintiff contends that Defendants' argument is erroneous as a matter of law, because "the

Federal Circuit has made clear that reasonable royalty damages are not capped at the cost of

implementing the cheapest available alternative." (*Id.* at 11).

I have already excluded Mr. Bluestein's testimony in this case and the Telit case, and I

likewise find that he is not qualified to testify, relying on the unrelated Beacham Reports or

otherwise, as to whether Defendants' proposed design around would be commercially

acceptable, feasible, or non-infringing. (*See generally* C.A. No. 12-33-RGA, D.I. 295 at 5–14).

Yet while Defendants are busy pointing out the lack of remaining expert testimony challenging

Dr. Negus's conclusions, they still must also prove their entitlement to judgment as a matter of

law in order to warrant summary judgment.[12]   Defendants' argument that damages can be no

---

[11] Plaintiff also argues that it properly considered non-infringing alternatives, because the damages analysis of Mr. Bluestein and Mr. Bero was based off of costs related to Dr. Negus's proposed alternative #5, a dedicated cloud-based platform. (D.I. 174 at 10). Because Mr. Bluestein's theory, that the next-best-alternative to the patented technology is a dedicated cloud-based platform, is no longer a part of this case, both parties' arguments regarding the availability of a dedicated cloud-based platform are no longer relevant.

[12] Defendants' briefing on this issue has virtually no legal analysis.

greater than the cost of a non-infringing alternative plus indirect costs fails as a matter of law. The Federal Circuit has outright rejected such arguments:

> [E]ven if [Defendant] had shown that it had an acceptable noninfringing alternative at the time of the hypothetical negotiation, [Defendant] is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative. . . . To the contrary, an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement.

*Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008). Likewise, while the existence of a non-infringing alternative "is a factor relevant to the determination of a proper royalty during hypothetical negotiations," it remains just that, a factor, and does not conclusively establish an upper limit on a reasonably royalty. *See Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996). That this is the state of the law makes a great deal of sense, to the extent that it is almost tautological. It remains the province of the jury to credit or discredit the opinions of Dr. Choi and Dr. Negus as to the feasibility, commercial acceptability, cost, and availability of their proposed, non-infringing alternatives. *See, e.g., Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt. . . . [T]he jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." (internal quotation marks omitted)).

Despite the exclusion of Plaintiff's current damages theory, I assume that if this case reaches trial, Plaintiff will offer some theory of damages. Any damages opinion ultimately suggesting a reasonable royalty other than $120,000 will create a factual dispute for the jury to decide. In any event, of even greater significance for purposes of this motion, expert testimony is not necessary to render the proper amount of damages a disputed issue. *See Dow Chemical*

*Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) ("[S]ection 284 is clear that expert testimony is not necessary to the award of damages, but rather '*may* [be] received[d] . . . as an aid.'" (quoting 35 U.S.C. § 284) (alterations in original)).  While Defendants criticize Plaintiff for offering attorney argument criticizing Dr. Negus's conclusions, Plaintiff may seek to discredit Dr. Negus's conclusions through cross-examination.  "[G]iven the great financial incentive parties have to exploit the inherent imprecision in patent valuation," a reasonable jury could reject the testimony of Dr. Negus and Dr. Choi that these proposed non-infringing alternatives were feasible, readily available, so inexpensive, and would not otherwise adversely affect Defendants' sales. *See CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks omitted).  Accordingly, I will deny Defendants' motion for summary judgment to cap damages at $120,000.

**IV.   CONCLUSION**

For the reasons set forth above, the Court will grant-in-part and deny-in-part Defendants' Motion for Summary Judgment of Non-Infringement and No Willfulness (D.I. 145), grant-in-part and deny-in-part Defendants' Motion for Summary Judgment on Damages Issues (D.I. 142), grant Defendants' Motion to Exclude M2M's Damages Experts Richard Bero and Whitey Bluestein (D.I. 147), and grant Plaintiff's Motion to Exclude Opinions of Dr. Choi (D.I. 140).  A separate order, consistent with this Memorandum Opinion, will be entered.